While awaiting change in traffic signal light from red (stop) to green (go) on Texas Street at intersection with Edwards Street in the City of Shreveport, Louisiana, about the hour of 10 o'clock A.M. September 3, 1940, the automobile of Henry H. Warren, at the time occupied by his wife and daughter, was rammed from the rear by the car of the Reverend Austin J. Hollingsworth, at the time driven by his son, Wayne. Mrs. Warren was seriously injured in the accident and this suit against the Gulf Insurance Company, carrier of public liability insurance on the Hollingsworth car, followed.
Mrs. Warren sues to recover a large amount in damages on account of the injuries, pain, suffering and discomfort experienced by her as direct results of the accident. Mr. Warren sues to recover the financial outlays made by him for treating his wife, consisting of physicians' and sanitarium bills. The case was tried after joinder of issue by answer and judgments were rendered as follows:
In favor of Mr. Warren for $425.12; in favor of Mrs. Warren for $2,500.
Plaintiffs and defendant each perfected devolutive appeal. Plaintiffs have moved to dismiss the appeal of the defendant on the ground that the judgment has been acquiesced in by voluntary execution. Defendant counters with the argument that the motion comes too late in that it was filed more than three days after the return date of the appeal. We are relieved from having to discuss and pass on these issues since mover's counsel have informed the court that they have reached the opinion the motion is not well founded and for that reason it may be treated as having been abandoned. We are in accord with counsel and, therefore, overrule the motion.
There is now no dispute as regards liability. Defendant's counsel concede that the accident was caused solely from the negligence of young Hollingsworth. The *Page 426 
testimony clearly warrants the admission. This leaves for determination only the amount of damages to which Mrs. Warren is entitled. Plaintiffs contend that the judgment should be materially increased, while defendant argues equally as strongly that the award of the lower court is excessive because not justified by the proven facts.
It is alleged that the accident caused a concussion of the brain and of the upper part of the spinal cord, a contusion of the cervical and upper dorsal vertebrae, with injury to the nerves and tissues of the neck; that the cartilages between the cervical vertebrae were permanently damaged. It is further alleged that since the happening of the accident Mrs. Warren has had a "grating" sensation in her neck, burning in her shoulders, suffered from earaches, headaches and pains shooting through the top of her head; that her neck pains her constantly; that she is nervous and unable to rotate her neck and head because of the stiffness of the muscles.
When the collision occurred Mrs. Warren was at the wheel. She had brought her car to a dead stop and was looking upward through the windshield at the traffic light so as to promptly go forward when the green light appeared. The impact was not extremely violent but was of sufficient force to cause "whipping" of the head and neck; that is, the first effect of the impact was a sudden jerk of the head backward and then to react forward. The suddenness of these movements caused the neck to audibly "pop".
Mrs. Warren testified that when the collision occurred, fearing that shattered glass might fly into her eyes, she released the wheel and covered her eyes with her hands; that she remarked to her daughter that she thought her neck was broken; that her left arm became numb and fell to her side; things began to look "black"; she felt dizzy, as though she was "going to vomit"; that realizing she was holding up traffic, she got out of the car and started to its rear to ascertain the extent of damages to it and then began to stagger, became dizzy and nauseated; that she leaned over on the fender at which time she was addressed by Mrs. Hollingsworth, mother of the driver, and a brief conversation ensued; that although her eyesight was affected, she returned to the car and drove around a block hoping to locate her daughter who had gone in search of a policeman. On her return to the locus of the accident, the daughter was there. She got in the car and the two proceeded to their original destination, the home of Mrs. Warren's mother in the western part of Shreveport. She remained there until late afternoon and then drove to her home in Oil City, some twenty miles north of Shreveport. To this time she did not realize her injuries were nearly so serious as they later proved to be, nor that she needed medical attention.
Miss Warren corroborated her mother's testimony covering the facts to the time she went in search of a policeman. Mrs. Hollingsworth contradicts Mrs. Warren's testimony about her physical action and movements after getting out of the car.
The day following the accident Mrs. Warren consulted her family physician who suggested that X-ray pictures be made as he was unable to make a dependable diagnosis from physical examination. The following day she was driven to Shreveport and there talked to Reverend Hollingsworth on the telephone. He advised her to go to Dr. S.C. Barrow's office to have pictures made. The claim agent of the insurer met her there. After the pictures were made, Dr. Barrow advised her to see Dr. W.P. Addison, defendant's regular physician. She did so and was examined by him. She says he gave her no advice as to what she should do. She returned home and says she "continued to suffer" and was afraid she was going blind as her eyes twitched and the back of her head "felt like a heavy weight was back there". She added, "My left arm would just get numb, could not move it and I was in such pain and felt like I was going to be paralyzed."
Two weeks having elapsed, the pain and discomfort persisting, and with no assistance nor advice from the insurer, Mrs. Warren decided to consult Dr. W.H. Browning. He made X-ray pictures and called in Dr. Oxford, an orthopedic surgeon, for consultation. The pictures did not reveal any bone injury. She was advised by these doctors that she had possibly suffered a concussion of the brain and was taken to a sanitarium for treatment. Her head was placed in traction for two weeks. This was followed by application of a brace for the neck which was worn a month. She testified that during this time she had continuous pains and was very nervous, the eyes twitching constantly. An *Page 427 
eye, ear, nose and throat specialist was called in and he made the usual examination, but found nothing seriously wrong with any of these organs. After leaving the sanitarium she returned home and was confined to her bed until the second week in December.
Dr. Browning found rigidity of the muscles of Mrs. Warren's neck, with tenderness over the first, second, third and fourth cervical vertebrae and over the second, third and fourth dorsal vertebrae. He called in Dr. Oxford because he thought there was some injury to the cervical spine and cord. The head and neck were placed in traction because these doctors thought there was contusion of the spinal cord, possibly of the brain, and nerve injury in that region. Traction, it is explained, would relieve pressure. The brace was designed to prevent turning of the head and traumatizing the nerves.
Dr. Browning's final diagnosis was that she was suffering from contusion of the spinal cord and injury to the nerve roots. He saw and examined her eight or ten times after she left the sanitarium, the last examination being on September 17, 1941, a month before trial. On each examination he found the same conditions to exist as were present on the preceding examination. She was suffering from pain and discomfort and the neck muscles were still rigid at time of trial. He testified:
"Q. As to her symptoms on the 17th of September, 1941, have they changed, or, if they have changed materially, state what the difference is over the period that has elapsed since then? A. There is no material change."
He would offer no prognosis as to time of recovery.
Dr. Oxford saw and examined Mrs. Warren several times subsequent to her discharge from the sanitarium, the last being on September 16, 1941. His diagnosis agreed with that of Dr. Browning excepting he thought possibly there was brain concussion. He, like Dr. Browning, could see no substantial improvement in her condition from the time of first examination and would not hazard a guess as to when she would fully recover. The fact that her trouble was due to concussion, he said, made uncertain the time of complete recovery.
Dr. Cohenour, a general practitioner, was of the opinion that Mrs. Warren had a concussion of the brain and of the cord.
Dr. Addison was called by defendant. He made a close physical examination of Mrs. Warren two days after the accident and found the same objective symptoms as were afterwards found by Drs. Browning and Oxford. The subjective symptoms were also the same. He diagnosed her injury as being "sprain of the posterior ligaments of the neck with some traumatic neuritis to the left bracia plexus." He explained that the neuritis would involve the nerves coming out of the neck, going down the shoulder and arm. It is commonly called neuralgia. He did not think there had been any concussion or contusion. He again saw Mrs. Warren on January 20, 1941. She was referred to Dr. D.L. Kerlin, who specializes in mental and nervous conditions, because, as Dr. Addison says, "she was showing a lot of nervous symptoms". Mrs. Warren was then making the same complaints as she did originally. The stiffness of the neck muscles was still present. Dr. Addison would not venture a guess as to the duration of her disability.
Dr. Kerlin examined Mrs. Warren in January and again in September, 1941. Both examinations revealed identical conditions. He testified as follows:
"Q. What did you find on your first examination? A. Well, the two examinations show practically the same findings. I diagnosed her condition as post traumatic syndrome, which was characterized by the following symptoms: Marked nervousness; stiffness in muscles of the neck; blur in the vision; sensation of numbness and tingling in the upper extremities, more on the left side; emotional instability; moodiness; irritability and depression. She presented also definite fears or phobias. For instance, phobia of riding in automobiles and phobia of insanity.
"Q. Were those symptoms, other than stiffness of the neck, objective or subjective? A. Most of those symptoms were subjective.
"Q. Did you find any improvement between your first examination and your next examination? A. There was very little change in her condition at the time of the second examination, which was in September. However, she did state that with reference to her nervous symptoms she had shown some little improvement.
"Q. Was there any indication in your examinations that there would be no recovery at all? A. What was that question, Mr. Switzer? *Page 428 
"Q. I say was there any indication to you that she would not recover completely? A. No, it was my opinion on both times I examined her that I thought the chances were very good for recovery."
Dr. Kerlin thought Mrs. Warren sincere in describing her symptoms and further added that "most of her symptoms could fit in with concussion of the cord". Among the symptoms referred to he named tingling and numbness in the upper extremities, pain in the shoulders and through the arm, and headaches.
There is no intimation or suggestion from any witness that Mrs. Warren is not sincere in describing the various pains, aches and discomforts which she asserts have beset her since the accident. All the doctors agree that whatever may have been the character of the original injury or injuries, she had not recovered from them when trial was had. We have not gained the impression from her testimony and general attitude all along that she would be willing to exaggerate the seriousness of her ailments because of this suit. To say that she did not suffer a serious injury is to ignore the virtually uncontradicted testimony.
When a person is required by capable physicians to submit to hospitalization for a month, be placed in traction and brace for several weeks, and not be able to leave bed for nine weeks after original injury, there irresistibly arises therefrom the conclusion that back of it all there must have been a serious cause. To emphasize the seriousness of the cause in this instance, not one of the physicians would hazard a prognosis for recovery.
Dr. Addison's diagnosis, so far as it goes, it seems to us, is plausible. He says the cartilages of the cervical vertebrae were injured and that the injury affected and/or involved the nerves which lead from that locus down the arm. This no doubt produced the numbness and tingling sensation.
It is reasonable to conclude that the "whipping" of the head and neck produced the injury to the cartilages and to this may be accredited the "popping" noise heard by Mrs. Warren and her daughter, and also the "grating" felt in the neck. It is highly probable that simultaneous with the injury to the cartilages there was contusion or concussion of the upper part of the cervical cord. We are of the opinion this did happen. The position of the head and neck, being at an upward angle when the car was struck, it seems to us, would enhance the chances for all of such injuries to occur.
There is considerable discussion, some uncertainty and not a little disagreement as to whether there was contusion or concussion of the cord. Whether one or the other, the result is the same. It is shown that either injury may be produced in ways other than by a lick or blow or other force externally applied.
For a long time prior to the accident, Mrs. Warren actively assisted her husband in the conduct of his drug store. She kept the books, waited on customers and, in general, performed duties of which she was capable. She enjoyed good health excepting she was allergic to certain foods for which Dr. Browning had treated her for over a year. It is probable the nervousness may in part be due to this. Since the accident she has not been physically able to work in the drug store beyond periods of supervision. Several of her neighbors, who observed her almost daily, testified to her disability.
Fixing of the quantum in this case, as so often happens, is not without difficulty. It is desirable, in fact always sought, in making awards for physical injuries to observe uniformity as far as possible; but, after all, each case must largely be gauged and solved in this respect upon and from its own peculiar facts. No fixed rule is possible of formulation. Giving credit to well-established facts of the case, and forgetting all others, we find ourselves in accord with the trial judge's action as regards the amount to which Mrs. Warren is entitled. It is certainly not excessive.
For the reasons herein assigned, the judgment appealed from is affirmed with costs. *Page 429